# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANAT MADAR,** | : | **CIVIL ACTION** |
| *Plaintiff*, | : | |
| **v.** | : | **No. 19-6033** |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| *Defendants.* | : | |

**Goldberg, J.**                                                                                      **May 27, 2021**

## <u>MEMORANDUM OPINION</u>

This case involves a dispute over demolished property which was located at 5025 Reno Street, Philadelphia, Pennsylvania. Plaintiff Anat Madar purchased this property through a Sheriff's sale, but before she ever fully acquired title, the Philadelphia Department of Licenses and Inspections ("L&I") scheduled it for demolition. Plaintiff only learned of the demolition after it was complete. As a result, Plaintiff filed suit against Defendants City of Philadelphia, Mayor James Kenney, and L&I Commissioner David Perri (collectively, "Defendants") seeking damages for the City's alleged failure to properly notify her. The Complaint sets forth causes of action for trespass (Count I), negligence (Count II), due process and equal protection violations under 42 U.S.C. § 1983 (Count III), and taking (Count IV).

Defendants move for summary judgment on all of Plaintiff's claims. For the following reasons, I will grant summary judgment in favor of Defendants.

## I.     UNDISPUTED MATERIAL FACTS

Unless otherwise indicated, the following facts are undisputed.[1]

### A.     <u>Plaintiff's Purchase of the Property</u>

Plaintiff owns, and has owned, several rental properties in Philadelphia.  (DSUF ¶ 31; PR ¶ 31.)  Over the past ten years, she has purchased and renovated and rented single properties in Philadelphia, some of which were purchased through Sheriff's sales.  (Defs.' Ex. A, Dep. of Anat Madar, 9:11–12:4.)

On March 21, 2019, a Sheriff's sale was held for a property located at 5025 Reno Street, Philadelphia, Pennsylvania (the "Property")  (DSUF ¶ 32; PR ¶ 32.)  As of the date of that sale, the Philadelphia Office of Property Assessment records showed the Property's owners as Norman Kenneth Jones and Delores Jones at 1719 Tulpehocken Street, Philadelphia, Pennsylvania.  (DSUF ¶ 33; PR ¶ 33; PSUF ¶ 14.)  A tax lien petition had previously been placed on the Property for taxes unpaid since 1999, and consequently, the City of Philadelphia had obtained a default judgment against Norman and Delores Jones. (Pl.'s Ex. H.)  Although the Property had twice been sold at a Sheriff's Sale—on December 15, 2017 and March 23, 2018—the purchasers did not comply with the terms of sale, and the Property had to be relisted.  (Pl.'s Ex. G.)

At a subsequent March 21, 2019 Sheriff's Sale, Coby Krispen of Advanced LLC—an experienced Sheriff's Sale purchaser acting on Plaintiff's behalf—successfully bid for the Property.  (DSUF ¶ 34; PR ¶ 34; Madar Dep. 17:6–18:14.)  The total purchase price was $12,100.  (DSUF ¶

---

[1]     References to the parties' pleadings will be made as follows:  Plaintiff's Statement of Undisputed Facts ("PSUF"); Defendants' Statement of Undisputed Facts ("DSUF"); and Plaintiff's Response ("PR").  To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions.  If a statement is disputed and can be resolved by reference to the exhibits, I will cite the supporting exhibits.  I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

35; PR ¶ 35; Defs.' Ex. H, at Interrogatory 2.)  Advanced LLC put down a deposit of $1,250, which was reimbursed by Plaintiff.  (Defs.' Ex. H, at Interrogatory 2.)  Plaintiff also paid Advanced LLC an additional $3,000 for its bidding services and assignment of the bid.  (DSUF ¶ 35; PR ¶ 35.)

On April 9, 2019, Plaintiff paid the balance of the purchase price of $10,850.  (Id.)  That same day, Plaintiff gave the Sheriff written instructions to convey title to her at her address of 206 Terwood Road, Huntingdon Valley, PA 19006, and the City Department of Revenue issued a Certificate of Compliance with the Sheriff's terms of sale.  (Pl.'s Exs. E & F.)  On April 23, 2019, Plaintiff's deed to the Property was acknowledged.  (DSUF ¶ 37; PR ¶ 37.)  That deed was recorded on May 3, 2019.  (DSUF ¶ 38; PR ¶ 38.)

As of the date of the March 21, 2019 Sheriff's sale, Plaintiff had never personally been to or seen a photograph of the Property.  Prior to the sale, Coby Krispen, from Advanced, LLC, had gone to the Property and reported on its condition to Plaintiff.  (DSUF ¶ 39; PR ¶ 39; Defs.' Ex. A, Dep. of Anat Madar ("Madar Dep."), 16:21–21:2.)  In addition, Plaintiff's contractor, Nimrod Ripner, had inspected the property from the outside and apprised Plaintiff of his observations.  (Madar Dep. 21:3–23:24.)  Based on the reports from Mr. Krispen and Mr. Ripner, Plaintiff was aware when she bought the Property that it had no roof and was in need of renovation.  (Id. at 22:14–23:5.)  Mr. Ripner provided Plaintiff an estimate of $95,000 to $100,000 in order to renovate the property with a three-bedroom house suitable for rent.  (Id. at 40:13–41:4.)  Plaintiff testified that, prior to purchase, she did not know the condition of the house, if it had any bedrooms or bathrooms, or working utilities, and she bought it with the intention of renovating it.  (Id. at 24:10–25:16; 32:8–20.)  She testified that she knew the Property was not "livable."  (Id. at 46:12–17.)

Importantly, Plaintiff also understood that, due to the Property's condition, she would need to obtain a "Make Safe" permit for the Property.  (Id. at 22:14–23:5.)  It is the policy of L&I, as posted on the public website, that a "Make Safe" building permit is required for a property owner

to repair a structure that has been marked as unsafe or imminently dangerous. (Defs.' Ex. V.) A Make Safe permit must include the complete scope of work and current owner information, and will only be issued if the property owner provides plans, pictures, and a Pennsylvania-licensed engineer's report. (Id.)

## B.     The City's Policy Regarding Unsafe Properties

The L&I Contractual Services Unit is responsible for the inspection of unsafe and dangerous properties in Philadelphia. (DSUF ¶ 20; PR ¶ 20.) When L&I code inspectors determine that a property is in violation of the City Code, that property is photographed, a violation is issued, and a physical notice of the violation is posted on the property. (DSUF ¶ 21; PR ¶ 21.) In 2019, and prior, the City Department of L&I maintained a policy requiring that the Department notify a property owner of a code violation by certified and regular mail. (DSUF ¶ 22; PR ¶ 22; Pl.'s Ex. J, Rule 30(b)(6) Deposition of City of Philadelphia Rep. Stephen Gallagher ("Gallagher Dep.") 10:20–11:10.) The property owner is the "owner of record" or "registered owner." (Id. at 12:22–13:2.) The notices are physically sent by clerical staff in the L&I Contractual Services Unit. (DSUF ¶ 23; PR ¶ 23.)

Stephen Gallagher, Director of Emergency Services at L&I, testified that L&I hires researchers to look for additional owners by investigating records at both the City's Office of Property Assessment website and the Sheriff's department to ensure that any new owner receives notice of violations. (Gallagher Dep. 6:18–24, 13:9–14, 14:15–16:24, 18:4–19.) The researchers also check to see if anyone is paying the taxes on the property and, if so, who that person is. [2] (Id.

---

[2]     (See also Pl.'s Ex. L, Dep. of Bartlett Clark ("Clark Dep.") 7:9–22. 10:10–13, 10:22–12:17, 13:4–23 (testifying, as the L&I official who runs the City's demolition program, that prior to a demolition, his department does research on a property to ensure that the proper owner gets notice); Pl.'s Ex. M., Dep. of Megan Flade ("Flade Dep."), 7:10–12, 8:23-9:2, 18:12-19:7, 20:15–19 (testifying as an administrative professional in the contractual services unit of L&I, that the department does "demo research" on properties scheduled for demolition by "research[ing] new

at 19:16–20:5.)  If a new owner is discovered, the property is removed from the demolition list, and the new owner gets a notice and an opportunity to correct the violation before demolition.  (Id. at 17:4–11; Flade Dep. 18:12–19:7.)   For every property that is scheduled for demolition, L&I employees will check to see if there is a Sheriff's sale that took place or is imminently pending. (Gallagher Dep. 14:15–15:10, 20:20–21:23.)  An exception to these procedures exists where there is a collapse of an unsafe property and the property needs to be demolished right away.  (Clark Dep. 14:18–15:14; Defs.' Ex. E, Dep. of Richard Quigley ("Quigley Dep."), 33:20–23.)

### C.     The Demolition of the Property

On June 12, 2018, significantly prior to Plaintiff's purchase of the Property, Inspector Victor Collins of the Philadelphia Department of Licenses and Inspections ("L&I") inspected the Property. Based on his observations, he declared it "Unsafe" because the roofing or roofing components on the porch roof had defects that showed signs of deterioration, fatigue, and/or inability to support normal loads.  (Defs.' Ex. K.)  Shortly thereafter, an Initial Notice of Violation and order for Unsafe Building was sent via certified mail to Norman and Delores Jones, who were the registered owners of the Property at the time.  (Id.; Defs.' Ex. F, Dep. of Victor Collins ("Collins Dep.") 37:14–23.) The Notice stated, in pertinent part:

> You are directed to obtain all necessary permits as required by the City and to make repairs or demolish the structure to remove the unsafe condition in order to address public safety.  Failure to comply with this order within 30 days may result in the City taking action to demolish the structure and to stucco remaining party walls exposed by the demolition.  You, the owner, will be billed for all costs incurred by the City, including administrative fees.

---

owners, sheriff sales, any past taxes owed, if there's permits in the system already applied for"); Pl.'s Ex. O, Dep. of Erica Marable ("Marable Dep."), 8:12–24, 13:10–19, 20:11–17 (testifying, as a service technician for L&I in the contractual services unit, that she did research on properties slated for demolition by pulling taxes owed, updated information on deeds, and Sheriff's sale information.)

(Defs.' Ex. K.)  The certified mailing containing the June 12, 2018 Notice of Violation was returned to L&I, the sender, as unclaimed on July 22, 2018.  (DSUF ¶ 54; PR ¶ 54.)

On March 25, 2019, L&I Inspector Barlett Clark conducted another inspection of the Property and again declared it "Unsafe" for the same reasons as set forth in the previous Notice. (Defs.' Ex. L.)  That same day, a "Final Warning Unsafe Building" Notice was again sent to Norman and Delores Jones.  (Id.)  That Notice contained the identical warning about demolition as was contained in the Initial Notice.  (Id.)  The certified mailing sent to Norman and Delores Jones was unclaimed.  (DSUF ¶ 59; PR ¶ 59.)

The Property suffered a collapse in April of 2019.  (Clark Dep. 14:14–15:1, 28:17–29:2; Quigley Dep. 7:10–18, 35:10–19.)  On April 11, 2019, L&I Inspector Clark and Richard Quigley, supervisor of L&I's Contractual Services Unit, received an emergency request regarding the condition of the Property.  (Quigley Dep. 35:12–23; Clark Dep. 28:17–2.)  Based on their inspection, the Property was declared "Imminently Dangerous" because the main roof and rear wall had collapsed, and the first and second floor had collapsed to the basement.  (Defs.' Ex. M.)  On April 12, 2019, a Final Notice of Violation and Order was sent, by certified mail, to Norman and Delores Jones stating, in pertinent part:

> You are directed to obtain all necessary permits as required by the City and to make repairs or demolish the structure to remove the imminently dangerous condition.  Failure to comply with this order forthwith shall result in the City taking action to demolish the structure and stucco remaining party walls exposed by the demolition as per Department policy.  You, the owner, will be billed for all costs incurred by the City, including administrative fees.

(Defs.' Exs. M and N.)  That Final Notice was unclaimed and returned to L&I on approximately May 17, 2019.  (Defs.' Exs. N and O.)

During his April 11, 2019 inspection, Inspector Clark took photographs of the Property's interior and exterior depicting its collapse.  (DSUF ¶ 64; PR ¶ 64; Defs.' Ex. I.)  Clark also "posted"

the Property by affixing a fluorescent red-orange poster to the Property stating that it was "imminently dangerous" and subject to demolition. (DSUF ¶ 65; PR ¶ 65; Defs.' Ex. I.)

On April 18, 2019, Clark took additional "pre-demolition" photographs of the Property and issued a curbside bid for contractors to issue bid to perform the demolition. (Clark Dep. 16:8–17:19; Defs.' Ex. J & R.; DSUF ¶ 70; PR ¶ 70.) A&M Curran was the low bidder for the project and received the contract. Id. On April 22, 2019, a building permit was issued by L&I for the demolition. (DSUF ¶ 72; PR ¶ 70; Defs.' Ex. P.) A&M Curran commenced demolition around May 1, 2019. (Defs.' Exs. P and S.)

L&I employees could not identify in the case file any indication that anyone at L&I contacted the Sheriff's department as to whether there had been or would be a sale. (Gallagher Dep. 35:6–23.) Gallagher had no personal involvement with the Property and had never inspected the Property. (Id. at 8:20–10:7.) Likewise, Richard Quigley, the supervisor of the Contractual Services Unit at L&I, testified that he did not know for sure if the Sheriff's sale records were checked with respect to Plaintiff's Property because such measures were "just standard operating procedure" and no records were kept. (Quigley Dep. 40:24–41:21.) Bartlett Clark, who ran the demolition program for the City of Philadelphia, explained that, with respect to the Property at 5025 Reno Street, "it was an emergency, so that overrides everything." (Clark Dep. 14:18–20.)

### D. <u>Procedural History</u>

On November 26, 2019, Plaintiff filed a complaint against the City of Philadelphia, Mayor James Kenney, and Commissioner of L&I David Perri, alleging trespass, negligence, violations of the Due Process Clause, Equal Protection Clause, and Takings Clause, and a separate claim under 42 U.S.C. § 1983. Defendants removed the case to federal court on December 20, 2019.

On December 11, 2020, Defendants filed a Motion for Summary Judgment on the entirety of the Complaint.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.  DISCUSSION

### A.    <u>Section 1983 Claims</u>

Plaintiff's Complaint sets forth claims for violation of the Due Process Clause, the Equal Protection Clause, and the Takings Clause.

Constitutional claims brought against state actors must be pursued under 42 U.S.C. § 1983.  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

42 U.S.C. § 1983. Local governments and municipalities are considered persons under § 1983 and may be sued directly under that section when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  <u>Monell v. Dept. of Soc. Servs. of City of NY</u>, 436 U.S. 658, 690 (1978).

"[A] government entity may not be held vicariously liable under § 1983 for the acts of its employees under a *respondeat superior* theory of liability."  <u>Win & Son, Inc.</u>, 162 F. Supp. 3d 449, 459 (E.D. Pa. 2016) (citing <u>Monell</u>, 436 U.S. at 691). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  <u>Monell</u>, 436 U.S. at 694; <u>see also</u> <u>Mulholland v. County of Berks</u>, 706 F.3d 227, 237 (3d Cir. 2013) ("When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." (quotation marks omitted)). "The 'official policy' requirement was intended to distinguish

acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986) (emphasis in original).

To succeed on constitutional claims under <u>Monell</u>, a plaintiff must: "(1) identify a policy, practice, or custom, (2) attribute it to the city, and (3) show a causal link between execution of the policy and the injury suffered." <u>Win & Son</u>, 162 F. Supp. 3d. at 459 (quoting <u>Losch v. Borough of Parkesburg</u>, 736 F.2d 903, 910 (3d Cir. 1984) ("A plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered."). The policy or custom must be the "moving force" behind the plaintiff's alleged injury. <u>Bd of Cty. Comm'rs of Bryan Cty., Oklahoma v. Brown</u>, 520 U.S. 397, 404 (1997). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." <u>Mulholland</u>, 706 F.3d at 237 (quotation and internal quotation marks omitted). And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." <u>Id.</u> (quotation omitted).

Here, Plaintiff sues only the City of Philadelphia and Defendants Kenney and Perri in their official capacities as City officials, meaning that it is a suit solely against the City. <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991) (holding that suit against individual in his/her official capacity is a suit against the governmental entity that employees that individual). Accordingly, I must now consider, under the <u>Monell</u> theory of liability, whether a genuine issue of fact exists on any of Plaintiff's constitutional claims.

1.      Substantive Due Process

Defendants first seek to dismiss Plaintiff's substantive due process claim.  Plaintiff offers no response to this argument. [3]

The substantive component of the Due Process Clause bars certain arbitrary and wrongful government actions that deprive an individual of life, liberty, or property.  U.S. Const., amend. XIV § 1; see also Tazioly v. City of Phila., No. 97-cv-1219, 1998 WL 633747, at *7 (E.D. Pa. Sept. 10, 1998) (citing Zinermon v. Burch, 494 U.S. 113, 125 (1990)).  The first step in assessing a substantive due process claim is to identify the constitutional interest that was allegedly aggrieved.  Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).  In order to successfully make out a substantive due process claim in the context of local land use regulations, "a plaintiff must establish as a threshold matter that he has a property interest protected by the Fourteenth Amendment's due process clause."  Maple Props., Inc. v. Twp. of Upper Providence, No. 00-cv-4828, 2004 WL 2579740, at *2 (E.D. Pa. Nov. 12, 2004) (citing Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1179–80 (3d Cir. 1997)).  As Plaintiff here owns a piece of property that was affected by Defendants' actions, she has established the presence of a property interest entitled to due process protection.  See Maple, 2004 WL 2579740, at *2 (citing DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell, 53 F.3d 592, 600 (3d Cir. 1995)); see also Cherry Hill Towers, LLC v. Twp. of Cherry Hill, 407 F. Supp. 2d 648, 654 (D.N.J. 2006) ("As owner of the Cherry Hill Towers property, Plaintiff clearly has a property interest protected by due process.").

The second step in the substantive due process analysis is ascertaining whether the identified property interest has, in fact, been aggrieved by the government.  Maple Props., 2004 WL 2579740,

---

[3]      Plaintiff does not specify whether she is proceeding under the procedural due process component or the substantive due process component of the Due Process Clause.  In the interests of comprehensiveness, I address both claims.

at *2. Government action does not violate substantive due process when merely prompted by an "improper motive." Cnty. Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 169 (3d Cir. 2006). Rather, the standard for determining substantive due process violations is whether government action rises to the level of "shocking the conscience." United Artists Theatre Circuit v. Twp. of Warrington, 316 F.3d 392, 400 (3d Cir. 2003). While there is no "calibrated yard stick" upon which to measure such conduct, the United States Supreme Court has recognized that "only the most egregious official conduct" qualifies. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 425 (3d Cir. 2006) (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845, 847 n.8 (1998)); see also Cherry Hill Towers, 407 F. Supp. 2d at 655.

Plaintiff fails to identify evidence of conscience-shocking behavior in the City's demolition of her Property without giving her actual notice. The Supreme Court has observed that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 491–92 (1987) (quotation omitted). "[T]he public interest demands that all dangerous conditions be prevented or abated," and, thus, inspections of private property designed at ensuring compliance with certain safety standards are not unconstitutional. Camara v. Municipal Court of San Francisco, 387 U.S. 523, 537 (1967).

In the analogous case of El Malik v. City of Philadelphia, No. 06-cv-1708, 2007 WL 984455 (E.D. Pa. March 26, 2007), the plaintiffs brought suit under § 1983 claiming, in part, that the City of Philadelphia and several City employees violated the plaintiffs' substantive due process rights when the City demolished three of the plaintiffs' structures because they were imminently dangerous. Id. at *1. The evidence in that case revealed that each of the structures had already partially collapsed and that the City properly deemed them "imminently dangerous." Id. at *7. The court found that "[t]he demolition of imminently dangerous structures in accordance with City

procedures does not shock the Court's conscience." Id. (citing Davet v. City of Cleveland, 456 F.3d 549, 552 (6th Cir. 2006) (finding that substantive due process claim failed because plaintiff could not establish that municipal actions taken pursuant to a valid condemnation order and in accordance with the procedures mandated by city and state law shocked the conscience or were arbitrary and capricious)).

Here, the undisputed facts reveal that the Property at issue was also "imminently dangerous." Under the Philadelphia's Property Maintenance Code, a building is deemed "imminently dangerous" when any part of it is in "imminent danger of failure or collapse" or has fallen or collapsed, and human life is endangered. Phila. Property Maintenance Code ("PM Code") § 110.1. The PM Code goes on to provide that

> If an imminently dangerous condition is found, the code official shall serve on the owner, managing agent or person in control of the structure a written notice describing the imminent danger and specifying the required repair to render the structure safe, or requiring the imminently dangerous structure or portion thereof to be demolished within a stipulated time. Such notice shall require the person thus notified to declare immediately to the code official acceptance or rejection of the terms of an order to demolish.

PM Code §110.2

> Where the order to eliminate an imminent danger is rejected or not obeyed, or when, in the opinion of the code official, immediate action is required to protect the public safety, the code official shall cause the necessary work to be done to demolish the structure or to render the structure temporarily safe. *Nothing in this code shall be deemed to limit in any way the right, under any existing law or ordinance, of any department of the City to correct or remove any condition deemed to be an immediate hazard to the health or safety of the public.* . . .

PM Code § 110.4 (emphasis added).

On June 12, 2018, Inspector Victor Collins of L&I inspected the Property and declared it "Unsafe" because the roofing or roofing components on the porch roof had defects that showed signs of deterioration, fatigue, and/or inability to support normal loads. (Defs.' Ex. K.) Both L&I

Inspector Clark and Richard Quigley, supervisor of L&I's Contractual Services Unit, testified that the Property suffered a collapse in April of 2019, and they received and emergency request regarding the condition of the Property. (Clark Dep. 28:17–29:2; Quigley Dep. 35:10–23.) Based on their inspection, the Property was declared "Imminently Dangerous." (Defs.' Ex. M.) According to the inspection, the main roof and rear wall had collapsed, and the first and second floor had collapsed to the basement. (Id.) Pre-demolition photographs of the Property, taken on April 18, 2019, demonstrate the dilapidated and dangerous condition of the Property. (Defs.' Ex. J.)

Plaintiff offers no contrary evidence to dispute that the Property was, in fact, "imminently dangerous" or to support the notion that the City's characterization of the Property was arbitrary. Indeed, Plaintiff admitted that, as of the date of the Sheriff's sale, she had never personally been to or seen a photograph of the Property. (Madar Dep.16:21–23:24.) Moreover, based on her agents' reports, Plaintiff was aware when she bought the Property that it had no roof and that she needed to obtain a "Make Safe" permit. (Id. at 22:14–23:5.)

As there is no genuine issue of material fact about the inherent danger of the Property, and as the demolition of an imminently dangerous structure does not shock the conscience, Plaintiff cannot maintain a substantive due process claim. Accordingly, I will grant summary judgment on this cause of action in favor of Defendants.

### 2. Procedural Due Process

Defendants also seek summary judgment on Plaintiff's procedural due process claim.

"At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard." Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998). In order to successfully establish a *prima facie* case of a procedural due process violation, a plaintiff must show: (1) there has been a deprivation of the plaintiff's liberty or property, and (2) the procedures used by the government to remedy the

deprivation were constitutionally inadequate. See Studli v. Children & Youth Families Central Reg'l Office, 346 F. App'x 804, 813 (3d Cir. 2009); Mulholland v. Gov't of Cty. of Berks, No. 10–cv-5616, 2012 WL 1057446, at *8 (E.D. Pa. Mar. 29, 2012), aff'd, 706 F.3d 227 (3d Cir. 2013).

Remedial procedures will be deemed constitutionally inadequate if "they contain a defect so serious [as to] characterize the procedures as fundamentally unfair." See Leonard v. Owen J. Roberts Sch. Dist., No. 08-cv-2016, 2009 WL 603160, at *4 (E.D. Pa. Mar. 5, 2009) (citing Daniels v. Williams, 474 U.S. 327, 341 (1987) (Stevens, J., concurring)). In other words, "the focus in procedural due process claims is on the adequacy of the remedial procedure, and not on the government's actual actions that allegedly deprived the individual of his liberty or property interest." K.S.S. v. Montgomery Cnty. Bd. of Comm'rs., 871 F. Supp. 2d 389, 397–98 (E.D. Pa. 2012). )). "The process that is 'due' in a given situation necessarily differs based on the particular circumstances." Maple Props., Inc. v. Twp. of Upper Providence, 151 F. App'x 174, 177 (3d Cir. 2005) (citations omitted).

In the context of property deprivations, the United States Supreme Court "has never employed an actual notice standard in its jurisprudence. Rather, its focus has always been on the procedures in place to effect notice." United States v. One Toshiba Color Television, 213 F.3d 147, 155 (3d Cir. 2000). Thus, "[d]ue process does not require that a property owner receive actual notice before the government may take his property." Jones v. Flowers, 547 U.S. 220, 226 (2006). It mandates only that notice be "reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950); see also Flowers, 547 U.S. at 220 (holding that notice is "constitutionally sufficient if it was reasonably calculated to reach the intended recipient when sent."). The Supreme Court has explained that if, for example, notice sent by certified mail is returned unclaimed, the municipality must "take

additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so." Flowers, 547 U.S. at 225. The Court recognized that such steps could include resending the notice by regular mail, addressing otherwise undeliverable mail to occupant, or posting notice on the front door. Id. at 236–37. A government's "open-ended search for a new address," however, is not required because it "imposes burdens on the State significantly greater than the several relatively easy options outlined above." Id. at 236.

Two recent cases, similar to the facts at issue here, considered and rejected a procedural due process claim in the context of section 1983 case against the City of Philadelphia for failure to notify about a property demolition. In Win & Son, Inc. v. City of Philadelphia, 162 F. Supp. 3d 449 (E.D. Pa. 2016), the plaintiffs brought a procedural due process claim against the City of Philadelphia after the City condemned and demolished a warehouse owned by plaintiffs containing valuable art and artifacts. because the policies. Id. at 453–57. The City's L&I Department had been notified of a collapse at the property and, upon inspection, declared the property "imminently dangerous." Id. at 453. The inspector posed a bright orange "imminently dangerous" poster on the side of the building, and that poster stated that the property may be demolished if not repaired. Id. The inspector entered the information from his report into L&I's case management system, and notice of the violation was automatically sent to the record owners via certified and regular mail. Id. at 454. The owners' address was listed to be at the property, but the owners actually had a different address. Id. As such, the certified mail notice was returned to L&I with the notation, "Unable to Forward," and the City took no further actions to provide notice of the violation. Id. The property's condition continued to decline, and the City entered into a contract for demolition. Id. at 455. Following demolition, the plaintiffs sued alleging, in part, a violation of procedural due process under 42 U.S.C. § 1983. Id. at 458.

The court granted summary judgment in favor of the City on this claim. Reviewing the Philadelphia Administrative Code and Property Maintenance Code, the court found that the official policies—specifically the provision allowing for notice by posting at the property—were sufficient to satisfy due process requirements. Id. at 460–61. The court remarked that while there were potentially genuine issues of fact regarding whether notice was actually provided, or whether the government employees failed in their responsibilities to follow City polices, those issues were not material because the plaintiffs had sued only the City and not the offending officers. In other words, the court held that the plaintiffs had not put forth a lack of adequate policies, which was their burden under Monell, but rather a lack of compliance with its enumerated policies. Id. at 462. Accordingly, the plaintiff's procedural due claim failed as a matter of law. Id.

Likewise, in the recent case of Johnson v. City of Philadelphia, No. 19-cv-1591, 2020 WL 2933853 (E.D. Pa. June 3, 2020), the plaintiff owned a vacant property in Philadelphia and was ordered to obtain a vacant property license, which he failed to do. Id. at *1. In the time between the City's order and the court date on his code enforcement complaint, the property's exterior wall began to bulge. Id. A City inspector came out and declared the property unsafe. Id. at *2. The inspector photographed the bulge and left a notice at the front door about the "unsafe" determination. Id. The notice also stated that if the plaintiff failed to obey the order, the structure would be subject to demolition within thirty days. Id. The next day, the inspector sent the plaintiff a Notice of Violation by certified mail, but the notice was returned as undeliverable because it was mailed to the incorrect address. Id. at *3. More than a month later, the property was reinspected and a second Notice of Violation was sent, but again that notice was returned as undeliverable. Id. Twelve days later, the City was called out to the property by the Fire Department due to falling bricks, and the inspector noticed that a wall had partially collapsed. Id. The inspector declared it "imminently dangerous," posted another notice on the property, and sent plaintiff a third notice of violation,

which was again returned as undeliverable.  Id. at \*3–4.  Two days later, demolition of the property began.  Id. at \*4.  Plaintiff sued alleging a procedural due process violation.  Id.

Considering Philadelphia's Administrative and Property Code provisions, the court found that "[t]hese policies and practices comply with Jones and ensure that notice is 'reasonably calculated, under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  Id. at \*9 (quotation omitted).  The court went on to note that even if the inspector's efforts at notice were inadequate, "a one-time failure to provide notice does not amount to a custom or policy of unconstitutional conduct for which the city may be held liable under § 1983."  Id.  Rejecting the plaintiff's argument that the inspector did not comply with the expected practice of mailing code violation notices to all known addresses for the property owner, the court held that "the § 1983 inquiry, as explained in Monell, . . . looks at whether the government had adequate policies, not at whether a government official complied with those policies."  Id. at \*10.  It concluded that "although there may have been a genuine issue of fact about whether notice was actually provided in this case, or whether particular government employees failed in their responsibilities to follow City policies, those facts were not *material* because the plaintiffs chose to sue the City alone rather than the offending officers."  Id. (internal quotation marks omitted).

Similar to Win & Son and Johnson, Plaintiff here has sued only the City and City officials in their official capacities, and not any City employees in their individual capacities.  As such, under Monell, "the relevant inquiry is whether the City's policies, practices, or customs were adequate to ensure that Plaintiff[] received the notice to which [she] was entitled under the Due Process Clause." Win & Son, 162 F. Supp. 3d at 460.

My consideration of this claim requires a review of the same Property and Administrative Code provisions at issue in Johnson and Win & Son.  Section 110.2 of the Philadelphia Property

Maintenance Code provides that if an "imminently dangerous" condition is found, the official shall serve on the owner a written notice describing the danger, specifying the required repair, or requiring the structure to be demolished within a stipulated time, and the notice shall require the owner to declare immediately to the code official acceptance or rejections of the terms. PM Code § 110.2. Section 110.3 of the Property Maintenance Code also states that, "[r]egardless of whether the person addressed with a notice of imminent danger receives service by one or more of the methods specified in the administrative code, *a copy of the notice shall be posted in a conspicuous place on the premises; and such procedure shall be deemed the equivalent of personal notice.*" PM Code § 110.3 (emphasis in original).

Section A-502.4 of the Philadelphia Administrative Code also sets forth the appropriate procedure for providing violation notices issued by City officials:

> **Method of service**: A notice of violation shall be deemed to be properly served if a copy thereof is delivered to such persons prescribed in Section A-502.3 by one or more of the following:
>
> 1. Personally;
>
> 2. By first class mail to the last known residence or business address;
>
> 3. By certified or registered mail to the last known residence or business address, return receipt requested;
>
> 4. By leaving it in the possession of an adult member of the person's family;
>
> 5. By leaving it in the possession of an adult in charge of the premises or persons place of business; or
>
> 6. *If no address is known or the mail is returned indicated no delivery, a copy of the notice shall be posted in a conspicuous place at the entrance or avenue of access to the premises and such procedure shall be deemed the equivalent of personal notice.*

Philadelphia Administrative Code A-502.4 (emphasis added).

According to the undisputed evidence, the Property at issue here was originally declared "Unsafe" on June 12, 2018, prior to Plaintiff's Sheriff's sale purchase, because the porch roof had defects that showed signs of deterioration, fatigue, and/or inability to support normal loads. (Defs.' Ex. K.) An Initial Notice of Violation and order for Unsafe Building was sent via certified mail to Norman and Delores Jones, who were the registered owners of the Property at the time, directing them to make all necessary repairs within thirty days. (Id.) The certified mailing of that Notice was returned to L&I, the sender, as unclaimed on July 22, 2018. (DSUF ¶ 54; PR ¶ 54.). Thereafter, on March 25, 2019—still prior to Plaintiff's purchase—the Property was again declared "Unsafe" and a "Final Warning Unsafe Building" Notice was sent on March 25, 2019, again to Norman and Delores Jones. (Defs.' Ex. L.) That Notice was also unclaimed. (DSUF ¶ 59; PR ¶ 59.)

In early April 2019, the Property suffered a collapse and was declared "Imminently Dangerous." (Defs.' Ex. M.) On April 11, 2019, the date of the inspection, photographs were taken of the Property's interior and exterior depicting its collapse, and the Inspector "posted" the Property by affixing a fluorescent red-orange poster to the Property stating that it was "imminently dangerous" and subject to demolition. (Defs.' Ex. I.) A Final Notice of Violation and Order was also sent by certified mail, on April 12, 2019, to Norman and Delores Jones, but that notice was unclaimed and returned to L&I on approximately May 17, 2019. (Defs.' Exs. N and O.) Demolition of the property commenced around May 1, 2019. (Defs.' Exs. P and S.)

Plaintiff contends that Defendants violated her procedural due process rights by failing to give her notice of their intention to demolish the Property. She posits that the City's "ill-defined" procedure for searching records was insufficient for due process requirements. She further asserts that the City should have had in place a written procedure "whereby information regarding properties sold at Sheriff's Sale and the identity of new owners be shared between its departments" and a "policy and procedure to both advise bidders at sale of the violation status of properties being

sold, and to require L&I, or another agency, to determine whether the property had been sold at Sheriff's Sale and to identify and notify the new owner before attempting to demolish a property." (Pl.'s Resp. 21.) Plaintiff presses that the City produced no evidence that it followed its unofficial policy to search the Sheriff's sale records before the proposed demolition, and she argues that it could have easily learned the identity of the new owner by contacting the Sheriff's office either by phone or through its website. Plaintiff avers that the City's failure to take any logical or reasonable steps, prior to demolition, to determine whether the Property had been sold, to ascertain the new owner's identity, and to notify Plaintiff that it intended to demolish the Property constitutes a violation of her procedural due process rights.

Plaintiff's argument fails on several grounds. First, while Plaintiff's suggestions to improve the notification process may be reasonable, mandatory implementation of such broad suggestions exceeds the demands of due process. The City has cited several official policies reasonably designed to ensure that sufficient notice is given, including certified mailing of the Notice of Violation to the owner's address of record, searching records of Sheriff's sales to determine if the property has been sold, and posting Notice at the Property. As the Court found in both Jones and Win & Son, the City's guidelines and procedures were reasonably calculated, under all the circumstances, to apprise interested parties of the violation and, in turn, were sufficient to satisfy minimum due process requirements. Absent evidence that such guidelines were routinely ignored, any isolated violation of them did not occur *pursuant* to a policy or custom or policy under which Monell liability can be imposed on the City. [4]

---

[4] Plaintiff relies on the case of City of Pittsburgh v. Piviorotto, 502 A.2d 747 (Pa. Commw. 1985) in which the Pennsylvania Commonwealth Court affirmed an order from the lower court holding the City liable for demolishing a house without providing notice to an individual who purchased the property at a delinquent tax sale. At issue there, however, was specifically whether the City's practice of making its final title search to ascertain the record owner at the time that bids for demolition were solicited satisfied the requirements of due process when the actual demolition

Second, it is undisputed that the City conspicuously posted the Notice at the Property, which, as the Supreme Court has recognized, is sufficient for due process concerns. See Flowers, 547 U.S. at 235 ("Occupants who might disregard a certified mail slip not addressed to them are less likely to ignore posted notice . . ."); Greene v. Lindsey, 456 U.S. 444, 452–53 (1982) ("Short of providing personal service, then, posting notice on the door of a person's home would, in many or perhaps most instances, constitute not only a constitutionally acceptable means of service, but indeed a singularly appropriate and effective way of ensuring that a person who cannot conveniently be served personally is actually apprised of the proceedings against him.").[5] Plaintiff admitted that at no point after the Sheriff's sale and prior to the demolition of the Property had she seen the Property. Thus, her failure to see the posted Notice cannot be deemed a due process violation.

Third, Plaintiff explicitly testified that, as of March 21, 2019, she was aware that the Property needed a Make Safe permit. (Madar Dep. 22:14–23:9; Defs.' Ex. H, at Interrogatory 2.) According to L&I's website, a Make Safe building permit is required "to repair a structure that has been marked

---

does not take place until weeks later. Id. at 751. The court found that the City's policy as to when it would finally check ownership was not reasonably calculated, under all the circumstances, to apprise interested parties of the City's plans to demolish condemned properties. Id. It held that due process did not require daily or weekly searches of the record to ascertain whether ownership of condemned properties has changed. Id. Rather, all that was required was "a single title search shortly before demolition begins." Id.

That policy is not at issue here. Indeed, unlike in Pivirotto, where the plaintiff's deed to the property was recorded one day after the City made its final title search but twenty-two days prior to actual demolition, it is undisputed here that Plaintiff's deed to the property was not recorded until after commencement of demolition.

[5] Plaintiff cites Greene for the proposition that notice by posting is not a reasonable method of service. The Supreme Court, in Greene, however, actually found that notice by posting was often sufficient to satisfy due process concerns. Only under the particular circumstances of that case did the Supreme Court deem notice of eviction proceedings posted on residences to be insufficient because the authorities knew that, in that area, notices were often removed from properties. Id. at 453 ("[W]hatever the efficacy of posting in many cases, it is clear that, *in the circumstances of this case*, merely posting notice on an apartment door does not satisfy minimum standards of due process." (emphasis added)).

Plaintiff has produced no evidence indicating that similar circumstances exist here.

as unsafe or imminently dangerous." (Defs.' Ex. V.) Thus, by Plaintiff's own admission, she had express notice that, at minimum, the Property had code violations and, at most, that it was marked "imminently dangerous," which would indicate that it would be demolished.

Finally, even had the City undertaken a more in depth search to find Plaintiff's identity, it is unclear that such a search would have yielded Plaintiff's name. Although none of the City's witnesses could affirmatively say what types of searches or owner investigations were done with respect to the Property here, the City's witnesses explained that searches through Sheriff's sales were "standard operating procedure." Here, the Property was marked as "Imminently Dangerous" on April 11, 2019, and a contract for demolition was entered into on April 22, 2019.

In short, while "[t]here may be genuine issues of fact regarding whether notice was actually provided in this case, or whether particular government employees failed in their responsibilities to follow City policies, [] they are not *material* under the theory Plaintiff[] ha[s] pursued" against only the City. Win & Son, 162 F. Supp. 3d at 462 (emphasis in original). As Plaintiff has sued only the City and its officials under a Monell theory of liability, the sole question is whether Plaintiff was injured as a result of an unconstitutional policy, practice, or custom of the City. As set forth above, Plaintiff has failed to identify any such unconstitutional policy, practice, or custom. Therefore, I will grant summary judgment in favor of Defendants on the procedural due process claim.

### 3.    Equal Protection Claims

Plaintiff also alleges that Defendants violated her rights under the Equal Protection Clause. Defendants respond that "regardless of the specific theory that Plaintiff attempts to invoke, this claim fails because the record contains no evidence whatsoever as to any 'similarly situated' person who received different or better treatment than Plaintiff." (Defs.' Mem. Supp. Summ. J. 21.) I agree with Defendants and will grant summary judgment on this claim.

The United States Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (internal citations omitted). A plaintiff asserting a "class of one" claim "must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006); see also Phillips v. Cty. of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008). "These challenges fail when 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Hwy. Materials, Inc. v. Whitemarsh Twp., 386 F. App'x 251, 259 (3d Cir. 2010) (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)). Notably, an equal protection claim is not "a device to dilute the stringent requirements needed to show a substantive due process violation." Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 287 (3d Cir. 2004).

Here, Plaintiff's Complaint merely asserts a violation of the Equal Protection Clause without any explanation for the basis for that claim. Plaintiff fails to flesh this claim out in response to Defendants' Motion for Summary Judgment. Absent any evidence that a similarly-situated property owner was treated better or differently than Plaintiff, I will grant summary judgment on this claim in favor of Defendants.

4.    Takings Claim

Plaintiff's takings claim alleges that the actions of Defendants in ordering, authorizing, and demolishing the dwelling on the Property without notice or permission of Plaintiff, and without opportunity for a prior hearing, constituted a *de facto* taking of Plaintiff's property for public use in

violation the U.S. Constitution.[6]  Defendants seek summary judgment, contending that Plaintiff has not produced any evidence to prove that her property was seized for public use; rather it was taken through the City's police powers to cure a dangerous condition.

The Takings Clause of the Fifth Amendment provides: ". . . nor shall private property be taken for public use, without just compensation."  It applies to the states as well as the federal government.  U.S. Const., amend V.  "[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it."  Knick v. Twp. of Scott, 139 S. Ct. 2162, 2170 (2019).  However, "[a] municipality may, in the exercise of its police, power, without compensation destroy a building or structure that is a menace to the public safety or welfare, or require the owner to demolish the dangerous piece of property."  In re 106 N. Walnut, LLC, 447 F. App'x 305, 309 (3d Cir. 2011) (quotation omitted).  "A property owner is only entitled to recover . . . if the government action 'deprived [him] of all or substantially all of the beneficial use' of the property."  Id. at 308 (quotation omitted).

Here, although Plaintiff cursorily asserts that the actions of the City were not a valid exercise of its police powers, Plaintiff does not dispute that the building on the Property had collapsed and was marked "imminently dangerous," as a threat to the public safety.  Plaintiff also does not allege that the City's actions deprived her of all beneficial use of the Property, only that the structure on the Property was demolished.  Finally, Plaintiff does not put forth any basis for a finding that the Property was taken for public use. Absent Plaintiff's production of evidence substantiating the core elements of a Takings Clause claim, I will grant summary judgment in favor of Defendants.

---

[6]      Plaintiff also raises this claim under the Pennsylvania Constitution and the Pennsylvania Eminent Domain Code but analyzes it solely under the U.S. Constitution.

**B.      Trespass and Negligence Claims**

Defendants next contend that Plaintiff's claims for trespass and negligence must be dismissed as a matter of law pursuant to the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa. Cons. Stat. § 8541, et seq.

The Tort Claims Act bestows absolute immunity from tort liability upon the Borough unless one of eight specific exceptions applies. 42 Pa. Cons. Stat. § 8541; Kiley v. City of Phila., 645 A.2d 184, 185 (1994). The eight exceptions are for (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody, or control of animals. 42 Pa. C.S. § 8542(b).  "[B]ecause of the [Tort Claims Act's] clear intent to insulate government from exposure to tort liability, the exceptions to governmental immunity are to be strictly construed."  Lockwood v. City of Pittsburgh, 751 A.2d 1136, 1139 (Pa. 2000) (citing Kiley, 645 A.2d at 185-86).  To satisfy one of the exceptions, a plaintiff must also establish that "[t]he damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity)." Id. § 8542(a)(1).

Plaintiff's trespass claim is clearly barred.   "The Tort Claims Act . . . renders the city immune from claims based on willful or malicious conduct.  It waives governmental immunity only with respect to 'negligent acts,' and specifically declares that negligent acts do not include willful or malicious conduct."  Win & Son, 162 F. Supp. 3d at 466–67 (quoting Lory v. City of Philadelphia, 674 A.2d 673, 675 (Pa. 1996)). Trespass is an intentional tort to "the extent deliberate conduct is averred," and to the extent that the claim avers mistaken conduct, it does not fall within an exception to governmental immunity for negligence.  Id. (quoting Roehrig v. Twp. of Cass, No.

1144 C.D. 2014, 2015 WL 5478354, at *4 (Pa. Commw. Ct. Aug. 18, 2015). The City is therefore immune from these claims.

As to Plaintiff's negligent demolition claim, Plaintiff argues that this case falls into the enumerated exception for claims arising out of the "care, custody and control of real property." 42 Pa. Cons. Stat. § 8542(b)(2). This exception, however, "is a narrow exception and, by its own terms, refers only to injuries arising out of the care, custody or control of the real property in the possession of the political subdivision or its employees." Mascaro v. Youth Study Ctr, 523 A.2d 1118, 1123 (Pa. 1987). For the exception to apply, the municipality's actions must have made "the property unsafe for the activities for which it is regularly used, for which it is intended to be used, or for which it may reasonably be foreseen to be used." Id. at 1124; Williams v. Phila. Hous. Auth., 873 A.2d 81, 86 (Pa. Commw. Ct. 2005) (holding that the City's "negligence must make the real property itself unsafe for its intended use" and that "dangerous condition or defect in the real estate" must cause the injury).

The Court in Johnson v. City of Philadelphia, No. 19-cv-1591, 2020 WL 2933853 (E.D.Pa. June 3, 2020) considered the viability of a tort claim that the city negligently demolished the plaintiff's property without proper notice. Id. at *5–6. The Court found that none of the requirements of the real property exception to the Tort Claims Act were satisfied. Id. at *6. First, the Court determined that the City of Philadelphia did not execute "care, custody, or control" over the property during the L&I inspector's inspections because the inspector's temporary occupation of the property did not constitute "possession" of the property. Id. (citing City of Pittsburgh v. Estate of Stahlman, 677 A.2d 384, 387 (Pa. Commw. Ct. 1996) (noting that "mere occupation of the property for a limited period of time" does not amount to possession)). Moreover, the Court remarked that the plaintiff's alleged injury was not caused by a property defect, but rather by the City's alleged failure to properly investigate or provide notice. Id.

Other cases have reached similar conclusions.  See, e.g., Win & Son, 162 F. Supp. 3d at 466 (granting summary judgment in favor of City on negligent demolition claim, holding that "[t]he only dangerous condition here was the product of Plaintiffs' neglect of the property.  In no sense can it be said that such conduction arose from the City's brief involvement with the property, all of which was intended to ameliorate a public threat.  Application of the real property exception to these facts would create an absurd and anomalous result."); Guy v. Bristol Borough, No. 16-cv-1557, 2018 WL 3141429, at *8 (E.D. Pa. June 27, 2018) (finding that negligent demolition claim against municipality  did not fall within any of the Tort Claims Act's exceptions).[7]

As no exception under the Tort Claims Act applies to either of Plaintiff's tort claims, I will grant summary judgment on them in favor of Defendants.

## C.     Claims Against Defendants Kenney and Perri

Finally, Defendants seek summary judgment in their favor on all claims against Mayor Kenney and L&I Commissioner Perri.  Plaintiff sues these defendants in their official capacities only.  (Compl. ¶¶ 3–4.)

"A suit against a city official named in his or her official capacity is a suit against the entity he or she represents."  Estate of Tyler ex rel. Floyd v. Grossman, 108 F. Supp. 3d 279, 289 (E.D. Pa. 2015) (citing Hafer v. Melo, 502 U.S. 21, 217 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the

_____

[7]     Plaintiff's cited cases do not support her contention that a negligent demolition claims falls within the real property exception to the Tort Claims Act.  In Oliver-Smith v. City of Philadelphia, 962 A.2d 728 (Pa. Commw. 2008), the Pennsylvania Commonwealth Court considered the propriety of a jury instruction on damages in a case in which the jury found the City liable on a negligent demolition claim.  Id. at 730–31.  Nothing in that decision addressed whether a negligent demolition claim falls within one of the Tort Claims Act's exceptions.

Plaintiff also cites Pivirotto v. City of Pittsburgh, 528 A.2d 125 (Pa. 1987).  The claims in that case, however, pre-dated the Tort Claims Act and, therefore, the court did not discuss governmental immunity under the Tort Claims Act.

government that employs them.")).   This principle holds true for suits against the Mayor of Philadelphia in his/her official capacity, <u>Kennedy v. City of Phila.</u>, No. 19-cv-1076, 2019 WL 1651606, at *3 (E.D. Pa. 2019), and against the Commissioner of L&I.   <u>Kovalev v. City of Phila.</u>, No. 07-cv-4875, 2008 WL 783564, at *2 (E.D.  Pa. Mar. 25, 2008).   To the extent claims against the entity are dismissed, the official capacity claims must also be dismissed.   <u>Estate of Tyler</u>, 108 F. Supp. 3d at 289.

Plaintiff brings only official capacity claims against Mayor Kenney and L&I Commissioner Perri.   Having granted summary judgment in favor of the City on all claims, I will likewise grant summary judgment in favor of Defendants Kenney and Perri on all claims against them.

## IV.   CONCLUSION

For all of the foregoing reasons, Defendants Motion for Summary Judgment will be granted in its entirety.   An appropriate Order follows.